In the Matter of Doris A. Montesani, Petitioner, against Arthur Levitt, as Comptroller of the State of New York, et al., Respondents.

Third Department, August 13, 1959.

*Aranow, Brodsky, Bohlinger, Einhorn & Dann* (*Lloyd I. Singer, Alfred J. Bohlinger* and *I. Stephen Rabin* of counsel), for petitioner.

*Louis J. Lefkowitz, Attorney-General* (*Milton Alpert* and *Paxton Blair* of counsel), for respondents.

REYNOLDS, J. This is a proceeding under article 78 of the Civil Practice Act to review a determination of the State Comptroller which denied the petitioner's application for an additional payment from the New York State Employees' Retirement System.

The petitioner's husband retired from the New York Insurance Department on February 21, 1949 due to ordinary physical disability. At that time he had an annuity reserve of $4,002.08 (consisting of his own contributions) and a pension reserve of $5,932.62. At the time of retirement his annuity reserve of $4,002.08 was transferred from the System's Annuity Savings Fund to its Annuity Reserve Fund, and his pension reserve of $5,932.62 was transferred from the System's Pension Accumulative Fund to its Pension Reserve Fund in readiness for payment. The amount of the monthly payment from these funds depends upon what mode of retirement the retiree chooses.

Deceased, just prior to his retirement, chose a mode which would pay the balance of his unused initial reserve (made up of both the annuity and pension reserve) to his beneficiary should he die before using up the initial reserve by way of monthly payments. This plan is known as Option One. Deceased had a choice among this and several other options or he could have simply taken his pension and annuity without option. Upon his death under the no-option plan, however, all unused moneys from his reserve would revert to the System (transferred back to its Pension Accumulation Fund) and be lost to his estate or beneficiary. Under Option One the pensioner would not be entitled to as high monthly payments as under the no-option plan. The difference, based on mortality

tables, is deducted and transferred back to the Pension Accumulation and Annuity Savings Funds from the reserve funds. The reduced amount is then sent to the pensioner. On the System's books this deduction is treated in two steps. First, an entry is made showing full payment to the pensioner. Second, another entry is made showing that the pensioner has paid the System a "premium" to insure his fund for payment to the beneficiary under Option One. The "premium", of course, is the amount deducted from the monthly allotment which, as far as the pensioner is concerned, is merely one transaction. The fictitious bookkeeping entry is necessitated because whether or not a pensioner is under an option *all* retirement allowances are originally computed on a no-option basis, i.e., the pensioner is treated as having elected the no-option, high monthly allotment plan. Apparently this system is more practical actuarially. Hence, an option pensioner, must pay a "premium" back to the System to "insure" his fund for his beneficiary.

Accordingly, the System computed deceased's annuity on a no-option basis of $33.74 per month and his pension on a no-option basis at $70.36 per month. Because of deceased's choice of Option One, an "insurance premium" of $11.29 per month was deducted from his annuity allotment to insure the annuity benefits upon his death. From his monthly pension allotment the sum of $23.56 was deducted as the "insurance premium". Thus, he was entitled to a monthly annuity payment of $22.45 and a monthly pension of $46.80.

At the time of deceased's retirement, however, section 83 of the Civil Service Law (L. 1947, ch. 841) read as follows:

"Section 83. Recovery of disability beneficiaries.

" * * *

" b. The pension of a disability beneficiary shall be reduced in the event that the comptroller shall determine that any such disability beneficiary is engaged in, or is able to engage in a gainful occupation paying more than the difference between his retirement allowance, as it would be if not reduced by the actuarial equivalent of any outstanding loan and if not increased by the actuarial equivalent of any additional contributions, and his final average salary. Such reduction shall be to a sum which, when added to an annuity, as so computed, plus the amount so earnable by him, shall equal his final average salary. If his earning capacity thereafter changes, his pension may be further altered. Any such altered pension shall not exceed:

" 1. The pension originally granted to such beneficiary, nor

" 2. An amount which, when added to an annuity, as so com-

puted, plus the sum earned by him, shall equal his final average salary.''

Because of subdivision b of section 83 above, the System determined that deceased was entitled to no pension allotment since his salary in the State of California was greater when added to his annuity than his final average salary had been in New York. In fact it is admitted that his earnings in California exceeded his final average salary. The System sent a letter to deceased stating this and offering him the opportunity to pay the monthly pension '' premium '' to insure the pension portion of the benefits after his death. That is, deceased would have to pay out of his own pocket $23.56 per month since there was no '' no option '' payment due him from the System from which the '' premium '' could be otherwise deducted. Deceased ignored the letter and never made these payments. The System accordingly transferred funds ordinarily payable to him from the Pension Reserve Fund to the Pension Accumulation Fund as required by law.

After his death deceased's wife claimed the entire balance of the initial reserve of $9,934.70. Under her theory this would amount to $8,430.55, the original fund being diminished by only $1,504.15 — the annuity allotments actually paid deceased. The System paid her $3,428.94 under Option One but denies her right to the other $5,001.61. Of this amount $3,203.54 was the sum of all pension payments withheld pursuant to section 83 during the time deceased was gainfully employed; $1,612.72 was the sum of the '' premiums '' (difference between no-option and option pension payments) which deceased had not paid; and $185.35 was interest on these unpaid premiums.

The wife claims that section 83 did not act to forfeit the amount withheld, but only to hold up such payment temporarily until such time as deceased's other earnings ceased. Likewise, she claims there is no statutory authority for the forfeiture of the $1,612.72 representing the '' premiums '' due but never paid and the $185.35 interest thereon. The System, on the other hand, maintains that these sums were forfeited — that although section 83 did not specifically prescribe for situations where the disability pensioner was under an option it applied to these people because they were all treated as if they were under no option for bookkeeping purposes. Also it is argued that there is no logical reason why option pensioners should have an advantage under section 83 over no-option pensioners. (Section 83 has subsequently been repealed and supplanted by a new provision under the new Retirement and Social Security Law enacted in 1955.)

In 1935 the Court of Appeals in *Roddy* v. *Valentine* (268 N. Y. 228) held that upon retirement a pensioner had an enforcible contract which could not be changed or altered by subsequent legislation. That his rights would be fixed on the date of his retirement. In 1938 section 7 of article V was added to the State Constitution. This amendment became fully effective in 1940 and provides that upon membership in a retirement system a contractual relationship shall arise, the benefits of which shall not be diminished or impaired. The history and application of this legal principle is discussed in *Matter of Day* v. *Mruk* (307 N. Y. 349 [1954]) and also *Birnbaum* v. *Teachers Retirement System* (5 N Y 2d 1 [1958]). It is evident that in the instant case deceased had a binding contract when he retired in 1949. Without the constitutional amendment the *Roddy* case (*supra*) is authority for this conclusion. Actually there is no dispute that the legislation in effect in 1949 controls this case.

Under his retirement contract deceased agreed that in return for a plan that would insure payment of the remainder of his initial fund to his beneficiary after his death he would accept a lower rate of lifetime compensation. Implicit in this agreement were various statutory provisions governing the rights of both parties. One of these provisions was section 83 which provided that if deceased were able to return to a gainful occupation or actually did so his pension would accordingly be reduced. This reduction would be governed by the amount he actually earned or was capable of earning. We now reach one of the major issues in the case, to wit: Is section 83 to be considered as a binding factor in his contract and if so does " reduce " mean " forfeit " or " temporarily suspended "?

It seems obvious that section 83 was in the law to protect the System against disability retirees who might, in truth, be capable of providing for themselves without being on dole (albeit a " contractural " dole). See *Matter of Stewart* v. *O'Dwyer* (271 App. Div. 485, 490 [1st Dept., 1946]), where such a purpose is ascribed to section 83's counterpart in the New York City retirement statute. Deceased quit his work here because of his physical defect and elected the plan of retirement he fancied most suitable. He impliedly agreed to all the terms of the contract which included section 83. When he became employed in California at a considerable salary section 83 came into play and cut off his monthly pension payments although his annuity payments were not affected (thus he was not being deprived of anything he had contributed). There is no per-

suasive argument that this was not proper. When the California employment ceased, assuming deceased to be still living, should he then be entitled to the withheld payments?

Section 83's counterpart with regard to nondisability pensioners, section 84, prescribes a reduction only if the pensioner should again take a public job. The disability pensioner is penalized if he takes *any* type of employment. The reason for the difference, of course, is that in one case the only reason pension benefits are available is because the pensioner is considered incapable of gainful employment, while in the other he has fully completed his " tour " and is considered as having earned his reward with almost no strings attached. It would be manifestly unfair to the ordinary retiree to accord the disability retiree the benefits of the System to which they both belong when the latter is otherwise capable of earning a living and had not fulfilled his service obligation. If it were to be held that withholdings under section 83 were payable whenever the pensioner died or stopped his other employment the whole purpose of the provision would be defeated, i.e., the System might just as well have continued payments during the other employment since it must later pay it anyway. The section says " reduced ", does not say that monthly payments shall be temporarily suspended; it says that the pension itself shall be reduced. The plain dictionary meaning of the word is to diminish, lower or degrade. The word " reduce " seems adequately to indicate permanency.

Aside from the practical aspect indicating permanency other indicia point to the same conclusion.

From 1924 (L. 1924, ch. 619) to 1947 (L. 1947, ch. 841) a provision appeared in the Civil Service Law which read substantially as follows: " If the pension of a beneficiary is reduced for any reason, the amount of such reduction shall be transferred from the pension reserve fund to the pension accumulation fund during that period that such reduction is in effect." (See L. 1924, ch. 619, § 2 [Civil Service Law, § 58, subd. 4]; L. 1947, ch. 841 [Civil Service Law, § 66, subd. e].) This provision reappears in the 1955 Retirement and Social Security Law as subdivision f of section 24. This provision is useful for interpretative purposes. Since it prescribes that moneys not paid because of reduction should be transferred back to the accumulation fund the conclusion is inescapable that such reductions were meant to be permanent. If temporary suspensions were intended this bookkeeping device would result in a false picture of the funds, i.e., the reserve fund would be depleted when it would contain adequate funds to meet eventual pay-

ments to present pensioners. Likewise, the accumulation fund would be improperly inflated with respect to the present pensioners.

Section 64 of the Retirement and Social Security Law (§ 85 under the 1947 act) provides that any disability pension must be reduced by the amount payable pursuant to the Workmen's Compensation Law if applicable. In *Matter of Dalton* v. *City of Yonkers* (262 App. Div. 321, 323 [1941]) this court interpreted " reduce " to mean " offset " in holding that under then section 67 (relating to Workmen's Compensation benefits as do its successors sections 85 and 64), pensions were to be offset by compensation benefits. This is merely another indication that " reduce " means a diminishing of the pension pursuant to a given formula rather than a mere recoverable, temporary suspension during the time other benefits or salaries are being received by the pensioner. (Also, cf., Retirement and Social Security Law, § 101 [§ 84 under the 1947 act].)

Further, see *Smith* v. *People* (47 N. Y. 330 [1872]) where it was held that words absolute in themselves, and language of the most broad and comprehensive nature may be qualified and restricted by reference to other parts of the same statute, to other acts *in pari materia,* passed before or after, or to the existing circumstances and facts to which they relate. So, also, contemporaneous legislation, although not precisely *in pari materia,* may be referred to for the same purpose.

Nowhere in the retirement law is there, or has there ever been, on a nonoption basis, the concept of reducing a retirement allowance and temporarily withholding the amount thereof for future payment to the pensioner, his estate or beneficiary. In sum therefore our view is that section 83 provided for a permanent reduction.

Petitioner, however, further relies on Option One which provided: " If he dies before he has received retirement allowance payments, equal to the *present value of his retirement allowance, as it was at the time of his retirement,* the balance thereof shall be paid to his estate or to the beneficiary so designated." (Civil Service Law, § 82; L. 1947, ch. 841; emphasis added.)

Petitioner argues that this controls, i.e., despite section 83 the option guaranteed that the initial fund should remain unviolated for the purpose of providing a base for later computations. Such a construction would give no effect whatever to section 83. In our view these allegedly inconsistent provisions are compatible. The Retirement System is obligated to operate on a sound actuarial basis. The law provides that at

the time of retirement certain reserves shall be established in the Pension Reserve Fund and the Annuity Reserve Fund, for the payment of retirement allowances. The reserves provide a retirement allowance without option, or an equivalent actuarial benefit under one of the options. They are all established on a no-option basis. A benefit under one of the options cannot have a greater actuarial value than the benefit without option, therefore a member by selecting an option cannot increase the actuarial value of the benefits to himself or his beneficiary. That is exactly what would occur here if petitioner's theory was adopted. It would result in no reduction of benefits on account of the earnings of the deceased because his beneficiary would receive the amounts withheld from him. This would be giving, as we have stated, no effect whatever to section 83 as it existed in 1949. The Legislature by its enactment of chapter 429 of the Laws of 1953 recognized in this connection the existing and valid actuarial practice of the Retirement System. (See statement of legislative intent in reference to ch. 429 in N. Y. Legis. Annual [1953], p. 79.) On this record it was demonstrated that the practice and procedure followed by the Retirement System was in accord with its long-standing actuarial practice and is actuarially sound.

Therefore the determination of the State Comptroller should be confirmed, without costs.

BERGAN, J. P., COON and GIBSON, JJ., concur; HERLIHY, J., concurs in the result.

Determination confirmed, without costs.